## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 15 2018, 11:05 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Frederick Vaiana
Voyles Vaiana Lukemeyer Baldwin &
Webb
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Stephen R. Creason
Chief Counsel

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jarron Fifer,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | November 15, 2018<br><br>Court of Appeals Case No.<br>18A-CR-1247<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Alicia A. Gooden, Judge<br><br>Trial Court Cause No.<br>49G21-1706-F4-22710 |

**Brown, Judge.**

[1] Jarron Fifer appeals his conviction for possession of a firearm by a serious violent felon, a level 4 felony. He raises one issue which we revise and restate as whether the evidence is sufficient to sustain his conviction. We affirm.

*Facts and Procedural History*

[2] On June 17, 2017, Indianapolis Metropolitan Police K9 Officer John Mark Archer, who was in full uniform and driving a fully marked police car, received a dispatch regarding shots fired in the area of 3500 North Shadeland. Officer Archer headed in that direction and received a description of the person shooting a gun as a thin black male wearing a dark shirt and white shorts and information that the possible person involved in the shooting ran northbound towards 38th Street. Officer Archer headed north in a commercial area, pulled into a parking lot, and saw a man matching the description walking southbound who he later identified as Fifer.

[3] Meanwhile, Deputy Constable Bryan Beeler, who worked part-time patrolling different hotels and was in full uniform and a marked police car, was at the Motor 8 hotel on Shadeland, also heard the dispatch regarding shots fired and a physical description, and saw Fifer who matched the description. When Officer Archer pulled into the parking lot both he and Deputy Beeler "observed why [they] were there." Transcript Volume II at 91.

[4] Officer Archer waited for Fifer to walk by him, exited his car, and asked him to stop and place his hands on the car. Fifer turned around, looked directly at Officer Archer, and just kept walking. After Officer Archer came around the

door of his car, Fifer "took off running." *Id.* at 56. Officer Archer told Fifer to stop or he was going to send the dog, but Fifer did not stop running.

[5] Officer Archer entered his car, pursued Fifer, and observed him run between two cars by the Webbles Bar & Grill. He also observed a chain link fence, which was about three and one-half feet high, and Fifer stop for a few seconds.[1] Deputy Beeler also pursued Fifer and observed him run along a fence line. Officer Archer never lost sight of Fifer but could only see his chest up to his head. Fifer then went back westbound parallel to the fence and dropped down to his knees at the end of the fence. Officer Archer said, "Don't run, I'm going to send the dog." *Id.* at 62. Fifer "got back up, and started running southbound again through the parking lot." *Id.* Fifer ran another thirty or forty feet, and the police dog apprehended him. Officer Archer "got the dog off of" Fifer, and Deputy Beeler arrived "right then and there" and secured Fifer in handcuffs. *Id.* at 63, 77. Officer Archer called for a medic so Fifer could be treated for his injuries.

[6] Officer Archer, who thought that the way Fifer acted was "very strange" because usually a suspect jumps a fence and "they're gone," returned to the area where Fifer went through the cars and up to the chain link fence, retraced Fifer's steps with Deputy Beeler and Indianapolis Metropolitan Police Officer

---

[1] Fifer's counsel asked Officer Archer: "[H]ow high do you think that fence is; do you know?" Transcript Volume II at 87. Officer Archer answered: "I don't know how high it is. That, um, I say it's probably 3 ½ . . . feet high." *Id.*

Jay Akers, looked around the chain link fence, and found a gun by the fence. *Id.* at 64. Officer Archer checked to see if Fifer had a license to carry a firearm and determined that he did not.

[7] Officer Akers searched Fifer and found a sock with a clear baggie of suspected cocaine in his left front pocket. Indianapolis Metropolitan Police Officer Katrina McEvilly, an ATF gun liaison, arrived at the scene and observed that the firearm was clean and was "just like laying perfectly on top of the grass." *Id.* at 117.

[8] On June 19, 2017, the State charged Fifer with unlawful possession of a firearm by a serious violent felon, a level 4 felony, possession of cocaine as a level 4 felony, and resisting law enforcement as a class A misdemeanor. The State later amended the charge of possession of cocaine to a level 5 felony and alleged that Fifer was an habitual offender.

[9] On April 3, 2018, the court held a jury trial. When asked if there was anything about the firearm, from his training and experience, that would indicate it had been outside for some time, Officer Archer answered: "Absolutely not." *Id.* at 68. He stated: "The gun was very clean, there was no mildew, or any water, or any type of anything on it. There was no rust. It was just laying like on top of the ground, on – on – off the grass." *Id.* He testified that there was no grass growing up through it and that he had previously encountered firearms that had been outside. The following exchange occurred during the direct examination of Officer Archer:

Q Once you found this loaded Glock 17 laying on the grass, did the previous few seconds with your encounter with Mr. Fifer make more sense to you?

A Yes.

Q And, tell – why is that?

A Due to the fact, that like I said, in the beginning, usually like I said, when people run from the police, fences like that, they clear them. They just keep running. I've seen people clear six foot ones like it's nothing, but he stopped right there, which – which really brought my attention to go back there. Um, and then of course, another thing he did, because I'm surprised he didn't jump the fence after that, he just ran back to the end of the fence, and then went south.

*Id.* at 72-73. On cross-examination, Officer Archer described the area as a high crime area. He stated: "When I . . . originally pulled into the parking lot, there were other people walking up by the liquor store, and around the hotel, yes." *Id.* at 82-83. When asked if, in his experience, he knew of people dropping or leaving behind items in the motel area or its parking lot, he answered: "No." *Id.* at 83. On redirect examination, Officer Archer indicated that it was a very quick encounter.

[10] Deputy Beeler testified that the gun appeared "[f]airly clean, new." *Id.* at 96. When asked if it looked like the gun "had been weighted down, and made a deep compression in the ground, or was it right on the surface," he answered: "Right on the surface." *Id.* He indicated that they do have some problems, "typically have some trespassers," and "occasionally fights through there." *Id.* During direct examination, the following exchange occurred:

> Q  What kind of foot traffic or how many people are around that evening?
>
> A  Very little foot traffic at that time, um, car wise, I counted five cars in the parking lot at the time everything was going down.
>
> Q  And, once the defendant was taken into custody, and you began to walk back through that path, were there any civilians there, or is it just police officers?
>
> A  Just police officers, because everybody had it quarantined off.

*Id.* at 97.  He also testified that in the two years he had worked at the Motor 8 hotel, he had not just randomly found a gun on the ground.  On cross-examination, Deputy Beeler testified that he did not see Fifer with a gun or observe him throw anything and that the gun costs approximately five hundred dollars.

[11]  Officer McEvilly testified that the recovered firearm was a Glock 17 and that all Glock firearms are designed "to where fingerprints cannot be transferred onto firearms" due to the use of textured metal and plastic.  *Id.* at 118.  When asked if she often obtained DNA during her previous processing of numerous firearms, Officer McEvilly answered: "Oh my gosh, no.  I wish.  I wish it was as easy, as they say."  *Id.* at 120.

[12]  The parties stipulated that Fifer was prohibited from possessing a firearm, State's Exhibit 10 was a firearm, the narcotics were determined to be cocaine, and no DNA profile could be identified due to an insufficient sample.

[13]     The jury found Fifer guilty of unlawful possession of a firearm, resisting law enforcement, and possession of cocaine. Fifer waived his right to trial by jury with respect to his status as a serious violent felon and habitual offender. The court found Fifer guilty of unlawful possession of a firearm by a serious violent felon, a level 4 felony, and found him to be an habitual offender. The court sentenced him to eight years with two years suspended for unlawful possession of a firearm by a serious violent felon, a level 4 felony, and enhanced the sentence by eight years for his status as an habitual offender. The court sentenced Fifer to concurrent sentences of one year executed for resisting law enforcement as a class A misdemeanor and three years executed for possession of cocaine as a level 5 felony.

## *Discussion*

[14]     The issue is whether the evidence is sufficient to sustain Fifer's conviction for possession of a firearm by a serious violent felon. Fifer focuses his argument on whether he possessed the firearm and asserts that no witness saw him with a firearm and that the State could not produce any fingerprint or DNA evidence linking him to any firearm. He asserts that the evidence is insufficient under the theory of constructive possession. The State argues that the evidence is sufficient and that Fifer requests that we reweigh the evidence. It also argues that Fifer incorrectly analyzes the case under the rubric of constructive possession where the only reasonable inference is that Fifer possessed the gun, ditched it mid-flight, and it was found by officers after having been tossed to the ground.

[15] When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. We look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* The conviction will be affirmed if there exists evidence of probative value from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id.* It is well established that "circumstantial evidence will be deemed sufficient if inferences may reasonably be drawn that enable the trier of fact to find the defendant guilty beyond a reasonable doubt." *Pratt v. State*, 744 N.E.2d 434, 437 (Ind. 2001).

[16] At the time of the offense, Ind. Code § 35-47-4-5 provided that "[a] serious violent felon who knowingly or intentionally possesses a firearm commits unlawful possession of a firearm by a serious violent felon, a Level 4 felony."[2]

[17] The record reveals that Officer Archer received a dispatch regarding shots fired, responded to the area, and observed Fifer who matched the description given by dispatch. Fifer "took off running" and did not stop after Officer Archer told him to stop. Transcript Volume II at 56. Officer Archer observed Fifer run between two cars near a chain link fence and stop for a few seconds before eventually running again. Officer Archer explained why he thought Fifer's actions were strange, returned to the area where Fifer had stopped, and

[2] Subsequently amended by Pub. L. No. 252-2017, § 19 (eff. July 1, 2017); Pub. L. No. 198-2018, § 9 (eff. July 1, 2018).

discovered a firearm. Officer Archer indicated that it was a very quick encounter, and Deputy Beeler indicated that there was very little foot traffic at the time of the incident and that he had not observed a gun on the ground in the two years he had worked at the Motor 8 hotel. The officers described the condition and position of the gun.

[18] Based upon the record, we conclude that the State presented evidence of probative value from which a trier of fact could have found Fifer guilty beyond a reasonable doubt of possession of a firearm by a serious violent felon.

## *Conclusion*

[19] For the foregoing reasons, we affirm Fifer's conviction for possession of a firearm by a serious violent felon.

[20] Affirmed.

Altice, J., and Tavitas, J., concur.